**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MEGAN LYNN UNDERWOOD-GORSKY
and STACY ERICKSON,

                                                        Case No.

          Plaintiff,                                    Hon.

v.

CONSUMERS ENERGY,

          Defendant.

---

Noah S. Hurwitz (P74063)
Brendan J. Childress (P85638)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
brendan@hurwitzlaw.com

---

**COMPLAINT AND JURY DEMAND**

Plaintiffs Megan Lynn Underwood-Gorsky and Stacy Erickson ("Plaintiffs"), by and through their attorneys, HURWITZ LAW PLLC, hereby state the following for their Complaint against Defendant Consumers Energy ("Defendant"):

**INTRODUCTION**

1.      This is a civil action for money damages, liquidated damages, costs, attorneys' fees and other relief against Defendant Consumers Energy ("Defendant").

2.      Plaintiffs assert claims of disability discrimination, failure to accommodate, and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").

1

## PARTIES AND JURISDICTION

4.      Plaintiff Underwood-Gorsky is an individual residing in Byron Center, Michigan.

5.      Plaintiff Erickson is an individual residing in North Muskegon, Michigan.

6.      Consumers Energy is an energy company headquartered in Jackson, Jackson County, Michigan.

7.      Plaintiffs' claims arise out of Defendant's violation of the Americans with Disabilities Act of 1991 42 U.S.C. § 12102(1).

8.      This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331.

9.      Venue is proper under 28 U.S.C. § 1391 because this is the judicial district where a substantial part of the events giving rise to the claims occurred.

10.      Plaintiff Underwood-Gorsky filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination alleging disability discrimination and received a "Right to Sue" letter on June 10, 2024.

11.      Plaintiff Erickson filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination alleging disability discrimination and received a "Right to Sue" letter on June 17, 2024.

## FACTUAL ALLEGATIONS

12.      Defendant is a for-profit utility company that provides electricity and natural gas for Michigan residents.

13.      Plaintiff Erickson was employed by Defendant from January 15, 2015, until her termination affective April 6, 2023.

14.      Plaintiff Underwood-Gorsky was employed by Defendant from February 6, 2017, until her termination effective April 13, 2023.

15.     On September 19, 2022, Plaintiff Underwood-Gorsky started a new position as Senior Technical Analyst Lead.  Plaintiff Underwood-Gorsky nevertheless continued to complete tasks for her previous position through the end of October due to staffing issues.

### Plaintiff Erickson's Medical Leave and Accommodations

16.     On February 12, 2022, Plaintiff Erickson took protected medical leave to have hip surgery.

17.     On April 13, 2022, while on protected medical leave, Plaintiff Erickson received a voicemail from Heather Horn advising her about Defendant's new voluntary separation plan.

18.     The next day, on April 14, 2022, Plaintiff Erickson received another voicemail from Heather Horn advising Plaintiff about Defendant's new voluntary separation plan.

19.     The same day, on April 14, 2022, Plaintiff Erickson sent Heather Horn an email thanking her for the voicemails but explaining that Plaintiff Erickson was still approximately 18 years from retirement.

20.     On May 3, 2022, Plaintiff Erickson had a post-operative/return to work follow-up appointment with Dr. Hamati.  Then, Dr. Hamati placed Plaintiff Erickson on Transitional Work Restrictions of "No excessive lifting, bending, twisting, or stooping."

21.     The next day, on May 4, 2022, Reed Group Case Worker Phyllis Mascaro called Plaintiff to question her Transitional Work Abilities, especially Dr. Hamati's use of the word "excessive."  During the call, Phyllis Mascaro informed Plaintiff that Defendant "isn't going to like" Hamati's use of the word "excessive."

22.     The same day, Reed Group Case Worker Phyllis Mascaro called Dr. Hamati's office.  Thereafter, Plaintiff Erickson's Transitional Work Restrictions were changed to "no bending, stooping, twisting, or standing for more than ½ a work shift" and a 40 pound weight limit.

These are the exact "Physical Demands" outlined by Plaintiff's job description.

23.     Plaintiff Erickson returned to work on May 9, 2022.

24.     On May 10, 2022, Plaintiff Erickson filed a formal complaint regarding numerous acts of unethical workplace conduct.  The complaint detailed numerous acts of retaliation, harassment, hostile work environment, promotion discrimination, and later added disability discrimination, HIPPA violations, age discrimination, and wrongful termination.

25.     On May 13, 2022, Plaintiff Erickson received a call from Ms. Mascaro who stated along the lines of "good news we had your restrictions fixed so you're good to go back to work." Of course, Plaintiff Erickson was already back to work on May 13, 2022.

26.     On May 20, 2022, Madia Atwell, Plaintiff Erickson's most recent supervisor, stated that starting on June 1, 2022, everyone must go into the plant or office 2 days per week.  Upon information and belief, Plaintiff Erickson was the only employee who fulfilled this new requirement.

27.     This same day, Plaintiff Erickson attended a meeting with Compliance regarding her complaint.

28.     On May 24, 2022, Plaintiff Erickson attended a meeting with her supervisor, Human Resources, and the department manager. During this meeting, she was given job expectations that conflicted with her medical restrictions.

29.     On June 6, 2022, Plaintiff Erickson reached out to Ethics and Compliance after not hearing back regarding her complaint.

30.     On June 16, 2022, Plaintiff Erickson sent another email to Ethics and Compliance stating "I'm being pushed to go against my medical restrictions" and "it does not appear that there are any accommodations being considered."

31.    Shortly thereafter, Defendant's Ethics and Compliance Department replied, dismissing Plaintiff Erickson's concerns.

32.    On June 20, 2022, Plaintiff Erickson communicated her objections to Defendant's decision, including stating "it feels like I'm being set-up to be fired or pushed out," stating that Ms. Atwell was "openly discussing [Plaintiff's] medical with co-workers and posting [Plaintiff's] medical status."

33.    Additionally, Plaintiff Erickson included information regarding Ms. Atwell pushing her to go against her medical restrictions by doing "little bits" of her work at a time, and stating "regardless, why would you tell someone to go against their medical restrictions? I'm sorry but that's medical discrimination in the workplace. They all know full well by now what my limitations are, and no one has responded to me until I got Corporate involved. So, one could only logically conclude at this point that it seems like no one cares plain and simple!"

34.    Plaintiff Erickson also stated that she would be "more than happy" to transfer to a position that better fit her medical restrictions.

35.    Ethics and Compliance responded the following day, informing Plaintiff Erickson that her complaints were "unsubstantiated."

36.    On August 4, 2022, Plaintiff Erickson's Transitional Work Abilities were updated to include no lifting over 10 pounds, sit down work only, no bending, stooping, and twisting until January 23, 2023.

37.    On November 14, 2022, Plaintiff Erickson attended a follow-up meeting regarding her job expectations and receiving additional responsibilities.

38.    On November 15, 2022, Plaintiff Erickson emailed Heather Horn reiterating her concerns. Specifically, she stated "I feel like I'm being set-up to fail. Especially now that I'm being

5

told I have to report on-site 2- 3 days a week, yet everyone else can work from home. We were just told a month or so ago that we can work remotely full-time. I'm curious what does [Ms. Atwell] think I'm going to be able to do in my situation? She's already tried to force me to go around my medical restrictions a couple times and I'm not willing to."

39.    Plaintiff Erickson additionally informed Ms. Horn that she had rights under the Americans with Disabilities Act and asked for a transfer.

40.    On January 18, 2023, Plaintiff Erickson attended a meeting regarding PEFD, informal correction plan, and documented counseling.

41.    On January 18, 2023, Plaintiff Erickson was evaluated as "Needs Improvement" for 2022, an evaluation closely tied with her protected medical leave and requests for accommodation.

42.    Despite being categorized as "Needs Improvement," Plaintiff Erickson's evaluation had many positive elements, including the following January 13, 2023, comments:

    a.    "Stacy took the lead to work with other DC team members to understand more of the construction process."

    b.    "Stacy shows agility in her work by supporting remotely as well as at the plant. She works well with plant personal and supports their needs."

    c.    "Stacy supported many storms in 2022 in this role. Her storm leadership provided positive feedback and witnessed her dedication."

43.    This same day, Plaintiff Erickson filed Appeal and Dispute Resolution regarding her evaluation.

44.    Plaintiff Erickson's appeal stated "I was cornered by management and HR after returning from a 12-week medical leave (mental breakdown and hip surgery) with strict sit down

only restrictions…" and "my Supervisor tried to force me multiple times to do the physical work regardless of my medical restrictions."

45.     On January 27, 2023, Plaintiff Erickson attended a meeting with Stephen Spadaro and Joseph Cortellini regarding her appeal.

46.     On January 31, 2023, Plaintiff Erickson met with Defendant's Absence Management to discuss her accommodations. During this meeting, Plaintiff Erickson was informed that Defendant would no longer permit her accommodations and was instructed to, along the lines of, "figure out how [she] was going to do [her] job without restrictions" by February 3, 2023.  Defendant's Human Resources informed her that she would be placed on unpaid leave if she did not comply.

47.     On February 3, 2023, Plaintiff received a dispute resolution response.

48.     On February 6, 2023, Plaintiff Erickson received a phone call from Eva Reed Group stating that Defendant "can no longer accommodate" Plaintiff Erickson's restrictions because they were "creating an undue hardship."

49.     At no time did Defendant articulate why Plaintiff Erickson's reasonable accommodation created an undue hardship.

50.     On February 11, 2023, Defendant terminated Plaintiff Erickson's logon access. Plaintiff Erickson's Microsoft Outlook and Microsoft Teams status showed as "status unknown" which is typical of an employee who has been terminated.

51.     On April 6, 2023, Defendant terminated Plaintiff approximately one hour after Plaintiff Erickson's appointment with Dr. Hamati due to "poor performance."

52.     Plaintiff Erickson had previously requested to receive help finishing the JH Campbell auditing project, which she had been tasked to complete herself, so that she could

continue sitting and receive assistance lifting heavy boxes.

53.      Upon information and belief, other employees of Defendant had additional help with lifting boxes and pushing carts, and they were required to assist with auditing projects.

### Plaintiff Underwood-Gorksy's Complaints

54.      Plaintiff Underwood-Gorsky began mentoring Plaintiff Erickson around September 2022.

55.      On November 14, 2022, Plaintiff Erickson was required to attend a PEFD check-in via Microsoft Teams and requested that Plaintiff Underwood-Gorsky attend for support.

56.      Madia Atwell, Plaintiff Erickson's direct supervisor, responded stating that Plaintiff Underwood-Gorsky's attendance was "not necessary for this meeting."

57.      Plaintiff Underwood-Gorsky responded stating "no problem, please let me know how I can help Stacy be successful in her current role and further her career,"

58.      Throughout November and December 2022, Plaintiff Underwood-Gorsky continued to meet with Stacy via Microsoft Teams to teach her about the distribution side of business.

59.      Plaintiff Erickson eventually confided in Plaintiff Underwood-Gorsky that Ms. Atwell, People and Culture Business Partner Heather Horn, Absence Management Angie Nortley, and Reed Group had changed her medical restrictions.  Plaintiff Erickson was forced to go back to her doctor to get her medical restrictions changed back to their original status.

60.      Plaintiff Erickson additionally stated that Ms. Atwell had revealed Plaintiff Erickson's medical information publicly on many Microsoft Teams calls, as well as informing the team of the reason for Plaintiff Erickson's medical leave.

61.      Ms. Atwell had been continuously increasing Plaintiff Erickson's amount of work,

some of which were Ms. Atwell's own tasks, as well as other members of the team. Plaintiff Erickson felt that she could not keep up with the amount of work being given to her.

62.     Plaintiff Erickson confided in Plaintiff Underwood-Gorsky that she believed Defendant was pushing her out by overloading her with work and revealing her medical information.

63.     Plaintiff Erickson had inquired about other employees' workload as she was concerned about the number of tasks being assigned to her. She was told that was none of her business.

64.     Plaintiff Underwood-Gorsky inquired about how she could assist with these issues and encouraged Plaintiff Erickson to reach out to People and Culture to submit a complaint.

65.     In December 2022, Plaintiffs met to look over Plaintiff Erickson's PEFD and the tasks she had accomplished throughout the year.

66.     On January 6, 2023, Plaintiff Underwood-Gorsky traveled to JH Cambell Plant for a job shadow. Plaintiff Underwood-Gorsky toured the job trailer that Plaintiff Erickson worked in, toured units 1 and 2, and assisted with the remainder of the filing tasks so Plaintiff Erickson could complete a JH Campbell auditing project.

67.     During this visit, Plaintiff Underwood-Gorsky noticed that Plaintiff Erickson was alone in an empty job trailer, despite her medical restrictions and being a fall risk due to her surgery.

68.     Upon information and belief, Defendant's policy required at least two employees in a building and therefore Plaintiff Erickson was not supposed to be alone in a job trailer.

69.     Between January 6 and January 18, 2023, Plaintiff Underwood-Gorsky met with Senior Manager Electric of Contractors Brady Driver to raise concerns regarding Plaintiff

Erickson.  Plaintiff Underwood-Gorsky informed Mr. Driver that Ms. Atwell has shared Plaintiff Erickson's private medical information and attempted to change her medical restrictions.

70.     Mr. Driver stated that Plaintiff Erickson should go to the EEOC and that as her supervisor, it was Plaintiff Underwood-Gorsky's duty to report anything that is unethical and illegal.

71.     Plaintiff Underwood-Gorsky additionally met with her direct supervisor, Electric Scheduling Manager Rachel Hayes, and informed her of the same concerns. During this conversation, Plaintiff Underwood-Gorsky shared that she was worried for Plaintiff Erickson and shared that she was scared she would be terminated if she became involved with Compliance.

72.     Ms. Hayes informed Underwood-Gorsky to meet with People and Culture Business Partner Corey Clark.

73.     On January 18, 2023, Plaintiff Erickson informed Plaintiff Underwood-Gorsky that she attended her year-end PEFD with Ms. Atwell and received a poor evaluation.

74.     The same day, Plaintiff Underwood-Gorsky emailed Mr. Clark regarding Plaintiff Erickson.

75.     Specifically, Plaintiff Underwood-Gorsky stated "It is very obvious that [Plaintiff Erickson's] supervisor has shared her private medical details with her coworkers, which baffles me because we know as supervisors that is an absolute no. Regardless, after she went to compliance about her supervisor, the supervisor very obviously started retaliating against her- telling her she had to perform duties beyond her job scope, as well as against her medical restrictions."

76.     Plaintiff Underwood-Gorsky also stated "As I have observed throughout the year, as more pressure got put on her supervisor for possibly doing things she shouldn't be doing (IE: sharing private medical details, forcing to perform beyond her medical duties) she started

retaliating against this employee. I thought it was against company policy to retaliate—but it is very obvious to me this happening. I'm scared to tell anyone because if her supervisor finds out it was me that said anything, I don't want my job to be at risk- because I really do enjoy it."

77.     Plaintiff Underwood-Gorsky also informed Mr. Clark that she found Plaintiff Erickson alone in an empty job trailer.

78.     Mr. Clark informed Plaintiff Underwood-Gorsky that he would escalate it to Compliance.

79.     On or around January 20, 2023, Plaintiff Underwood-Gorsky met with Executive Director of Work Management and Customer Delivery Dean Beach to discuss Plaintiff Erickson. Plaintiff Underwood-Gorsky informed Mr. Beach of Ms. Atwell's treatment of Plaintiff Erickson and inquired about creating a position for Plaintiff Erickson on her team.  Plaintiff Underwood-Gorsky also informed Mr. Beach that Plaintiff Erickson had requested to be moved to another department.

80.     Mr. Beach informed Plaintiff Underwood-Gorsky that she needed to create a business case in hopes of receiving an additional headcount, but stated the spot may not be in her department.  Plaintiff Underwood-Gorsky thereafter immediately began working on the business case.

81.     On January 30, 2023, Plaintiff Underwood-Gorsky attended her year-end evaluation with Ms. Hayes.

82.     Ms. Hayes gave Plaintiff Underwood-Gorsky a glowing review, stating "overall, Megan's transition into her new role has gone well and she has already demonstrated growth as a leader.  Moving into 2023 I am excited to watch the progress within her team and look forward to helping her grow as a leader."

83.     On February 7, 2023, Plaintiff Underwood-Gorsky attended a biweekly one-on-one with Ms. Hayes, informing her that she went to People and Culture regarding her concerns about the treatment of Plaintiff Erickson. Ms. Hayes expressed her pride with Plaintiff Underwood-Gorsky for raising these issues.

84.     Later that same day, Plaintiff Underwood-Gorsky met with Mr. Clark and her boss. They informed Plaintiff Underwood-Gorsky that it is against company policy to listen without announcing yourself on a phone call.  Mr. Clark additionally told Plaintiff Underwood-Gorsky to mind her own business and stay out of it.

85.     This comment was seemingly regarding the Microsoft Teams meeting that Plaintiff Erickson requested Plaintiff Underwood-Gorsky's presence at. After the denial of her attendance, Plaintiff Underwood-Gorsky did not attend the meeting and did not listen in to the conversation.

86.     Instead, Plaintiff Erickson had recorded the Microsoft Teams meeting and showed Plaintiff Underwood-Gorsky the recording a few days later.

87.     Plaintiff Erickson had recorded multiple meetings to show Plaintiff Underwood-Gorsky the unfair treatment and medical discrimination that she was facing but Plaintiff Underwood-Gorsky was never present during the meeting.

88.     Patrick J. McCarthy, a co-worker of Plaintiff Underwood-Gorsky, reached out stating "Be careful asking tough questions or calling attention to things in the town halls and co-worker conversations. I know of three people, including myself, who have either had a direct conversation with P&C or had messages passed down to either 'be careful,' or in my case, effectively to not speak up during town halls any more."

89.     In March 2023, Plaintiff Underwood-Gorsky was recognized for completing and submitting a waste elimination that saved Defendant around $466,000.

90.     In April 2023, Plaintiff Underwood-Gorsky received a merit increase in pay.

91.     On April 13, 2023, however, Plaintiff Underwood-Gorsky was shockingly terminated. Her termination letter stated that she demonstrated ineffective leadership and lacked accountability, and Defendant had "lost trust and confidence" in her leadership ability. The letter also falsely accused her of secretly attending a PEFD session.

92.     Plaintiff Erickson did not receive any verbal or written warnings prior to being terminated.

93.     Plaintiff Underwood-Gorsky submitted documentation appealing her termination on April 16, 2023.

94.     In her appeal, Plaintiff Underwood-Gorsky highlighted the inaccuracy of the termination letter, including that "ineffective leadership" and lacking accountability were in direct contradiction with her 2022 evaluation and that she had never secretly attended any PEFD session.

95.     On April 24, 2023, Plaintiff Underwood-Gorsky met with Senior Employee Relations Consultant Stephen Spadaro to discuss her appeal.

96.     On April 27, 2023, Mr. Spadaro called Plaintiff Underwood-Gorsky and stated that after a thorough investigation, it was determined that Plaintiff was terminated justly.

97.     Plaintiffs were excellent performers of their job duties and were otherwise qualified to perform their roles.

98.     Plaintiff Underwood-Gorsky would not have been terminated but for her opposition to Defendant's unlawful treatment of Plaintiff Erickson.

99.     Plaintiff Erickson would not have been terminated but for her disability and request for accommodation.

### COUNT I- PLAINTIFF ERICKSON
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### DISABILITY DISCRIMINATION–FAILURE TO ACCOMMODATE

100.    Plaintiff Erickson restates the foregoing paragraphs as set forth fully herein.

101.    Plaintiff Erickson has a "disability" as defined in 42 U.S.C. § 12102(1).

102.    Plaintiff Erickson was regarded as having a disability under 42 U.S.C. § 12102(3)(A).

103.    Defendant was legally required to engage Plaintiff Erickson in an interactive process before terminating her.

104.    Defendant discriminated against Plaintiff Erickson on account of her "actual or perceived" disability when she was terminated on April 6, 2023.

105.    Defendant's actions were knowing and willful.

106.    "Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability."  29 C.F.R. app. § 1630.9.

107.    An employee begins the accommodation process by notifying her employer of her disability; "at that point, an employer's liability is triggered for failure to provide accommodations."  *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998).

108.    After an employee has disclosed that she has a disability, the ADA requires an employer to "engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).

109.    Rather than collaborate with Plaintiff Erickson or her doctor to find reasonable accommodation, Defendant chose to terminate Plaintiff Erickson.

110.    The law requires an employer to seek an explanation from the doctor if it had concerns with the employee's medical diagnosis. *Bultemeyer v. Fort Wayne Comm. Sch.*, 100 F.3d 1281, 1286 (7th Cir. 1996).

111.    The employer's conduct is actionable "if it prevents identification of an appropriate accommodation for a qualified individual." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013).

112.    An employer fails to engage in good faith when "the interactive process . . . was still ongoing when the employer terminated the worker's employment." *Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 336 (6th Cir. 2013).

113.    "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *King v. Steward Trumbull Meml. Hosp.*, Inc., 30 F.4th 551, 567 (6th Cir. 2022) (citing *Cutrera v. La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).

114.    Plaintiff Erickson has suffered feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future, as a direct and proximate result.

115.    Plaintiff Erickson was placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer

additional damages in the future, as a direct and proximate result of the violation.

**COUNT II- PLAINTIFF ERICKSON**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**<u>RETALIATION</u>**

116.    Plaintiffs incorporate by reference herein the foregoing paragraphs and allegations.

117.    Plaintiff Erickson engaged in protected activity when, in good faith, she requested accommodations for her disability.

118.    This exercise of protected rights was known to Defendant.

119.    In retaliation for submitting medical accommodations and complaining about disability discrimination, Plaintiff Erickson was subjected to adverse employment actions by Defendant.

120.    Defendant's reasons for taking these actions were retaliatory and not legally justified.

121.    As a direct and proximate result of Defendant's violation of the ADA, Plaintiff Erickson has suffered bodily injury, feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

122.    As a further direct and proximate result of Defendant's violation of the ADA, Plaintiff Erickson has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

**COUNT III- PLAINTIFF UNDERWOOD-GORSKY**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
<u>**RETALIATION**</u>

123.    Plaintiffs incorporate by reference herein the foregoing paragraphs and allegations.

124.    42 U.S.C. § 12203(a) prohibits "discriminat[ion] against any individual" who "opposed any act or practice" made unlawful by the ADA or because such individual has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA. Because the ADA's anti-retaliation provision is similar to that of Title VII, the retaliation standard enunciated in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) applies to retaliation claims under the ADA and serves as a template against which ADA retaliation claims may be judged.

125.    Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). These two clauses are known as the "opposition clause" and the "participation clause." *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 129 S.Ct. 846, 850 (2009). A claim is brought under the opposition clause when it involves opposing a violation of Title VII. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir.1989).

126.    Types of activity which constitutes opposition includes: "Complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer, e.g., former employers, union, and co-workers." *Johnson v. University of Cincinnati*, 215 F.3d 561, 579 (6th Cir.2000).

127.    In construing the opposition clause, the Sixth Circuit explained that the challenged activity need not actually violate Title VII. Id. at 580. Instead, the plaintiff must only have a reasonable belief that the defendant has committed an unlawful employment practice. Id. Applying that standard here, the Court finds the complaint was protected activity. See *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir.), *cert. denied*, 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998) (considering claim for disability harassment without disavowing that such a claim exists). The crux of Plaintiff's complaint was that she was being harassed by her co-workers in retaliation for taking off work due to her disability.  She specifically stated in the complaint: "[d]o [sic] to this harassment and retaliation it has aggravated my illness and completely disrupted the branch ... This was a violation of our union contract and handbook." Def. Mot., Exh. N. This was sufficient notice of a possible claim of disability harassment.  Plaintiff has met the first two prongs of her prima facie case.

128.    To establish the requisite causal link, Plaintiff "must present evidence sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action." *Brown v. Chase Brass*, 14 Fed. Appx. 482, 2001 U.S.App. LEXIS 15726 at *7 (quoting *Cohen v. Fred Meyer, Inc*., 686 F.2d 793, 797 (9th Cir.1982)). Temporal proximity alone is insufficient to establish a causal connection for a retaliation claim. *Little v. B.P. Exploration & Oil Co*., 265 F.3d 357, 363–64 (6th Cir.2001). But "temporal proximity ... with other evidence of retaliatory conduct [may be] sufficient to establish a causal connection. Id. at 364.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs requests the following relief:

a.      Compensatory damages for monetary and non-monetary loss;

b.      Exemplary and punitive damages;

c.      Prejudgment interest;

d.      Attorneys' fees and costs; and

e.      Such other relief as in law or equity may pertain.


                                        Respectfully Submitted,

                                        HURWITZ LAW PLLC

                                        /s/ *Noah S. Hurwitz*
                                        Noah Hurwitz (P74063)
                                        Attorneys for Plaintiff
                                        340 Beakes St., Ste. 125
                                        Ann Arbor, MI 48104
                                        (844) 487-9489
                                        *noah@hurwitzlaw.com*

Dated: September 3, 2024

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MEGAN LYNN UNDERWOOD-GORSKY
and STACY ERICKSON,

                                                      Case No.

          Plaintiff,                         Hon.

v.

CONSUMERS ENERGY,

          Defendant.

---

Noah S. Hurwitz (P74063)
Brendan J. Childress (P85638)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St. STE 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
brendan@hurwitzlaw.com

---

**<u>DEMAND FOR TRIAL BY JURY</u>**

      Plaintiffs Megan Lynn Underwood-Gorsky and Stacy Erickson, by and through their

attorneys, Hurwitz Law PLLC, hereby demands a trial by jury in the above-captioned matter for

all issues triable.

                                          Respectfully Submitted,
                                          HURWITZ LAW PLLC

                                          */s/ Noah S. Hurwitz*
                                          Noah S. Hurwitz (P74063)
                                          *Attorney for Plaintiff*

Dated: September 3, 2024